# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| LISA CARVALHO, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | C.A. No. 19-287 JJM-LDA |
| | ) | |
| SANTANDER BANK, N.A., | ) | |
|     Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Plaintiff Lisa Carvalho alleges that, during her tenure as a District Executive at Defendant Santander Bank, she was sexually harassed, subjected to a hostile work environment, and retaliated against because of her gender. More specifically, she submits evidence showing her supervisor used sexual language and barraged her with sexual innuendo that was inappropriate in the workplace; and when Ms. Carvalho rebuffed her suggestions and rejected her advances, Santander fired her ostensibly for cause. Ms. Carvalho sued under Title VII of the Civil Rights Act of 1964 and Rhode Island state law. Santander Bank denied these claims and filed a Motion for Summary Judgment seeking dismissal of Ms. Carvalho's case. ECF No. 40. The Court GRANTS summary judgment for Santander Bank on Count I and DENIES summary judgment on Counts II and III.

## I.    BACKGROUND

Santander is a national bank with operations in the northeast United States. ECF No. 41 ¶ 1.  At the time relevant to this suit, local Santander branches were managed by Branch Managers, who reported to their respective District Executives, who in turn reported to the Region President.  *Id.* ¶ 3.

In 2016, Santander hired Ms. Carvalho to work as a District Executive at Santander, reporting directly to Region President Sarah Lindstrom.  *Id.* ¶¶ 6, 8. Several senior executives interviewed her for the position, including Ms. Lindstrom. *Id.* ¶ 6.  For the prior fifteen years, Ms. Carvalho had held positions with several financial institutions.  *Id.* at ¶ 7.[1]

### A. Harassment

Ms. Carvalho details incidents that occurred during an approximately six-month period in 2016-17.  Before Ms. Carvalho was hired, Ms. Lindstrom allegedly made several comments about Ms. Carvalho being young, attractive, and energetic, "the way Santander employees should look."  ECF No. 50 ¶ 88.  After she started working for Ms. Lindstrom at Santander, Ms. Lindstrom regularly interjected sexual matters into their work relations.  For example, one month into Ms. Carvalho's employment at Santander, Ms. Lindstrom hosted a "team appreciation" event at a

---

[1] When she began working at Santander, Ms. Carvalho received and signed Santander's Anti-Discrimination and Harassment Policy containing provisions concerning unlawful conduct, retaliation, and reporting incidents to employee relations. ECF No. 41 ¶ 9. She also received and signed a Code of Conduct and Ethics Policy about grounds for disciplinary action. *Id.* ¶¶ 11-12.

bowling alley. *Id.* ¶ 90. During the event, Ms. Lindstrom asked several female employees if they had ever kissed a girl. *Id.* ¶ 92.

At two social gatherings on consecutive nights in 2016, Ms. Carvalho contends that Ms. Lindstrom asked detailed questions about prior sexual experiences with women. ECF No. 41 ¶¶ 37, 38; ECF No. 45 ¶ 37. At the first, Ms. Lindstrom started and pushed the conversation by repeatedly asking detailed and graphic questions about prior sexual experiences with females. *Id.* Ms. Carvalho felt that Ms. Lindstrom was intimating that she wanted to have a sexual relationship with her. *Id.* The next evening, at Ms. Carvalho's home, Ms. Lindstrom positioned herself next to Ms. Carvalho on the couch and asked her what she thought about the prior night's conversation. ECF No. 41 ¶ 41. Ms. Lindstrom asked Ms. Carvalho if she would engage in oral sex with a woman. *Id.* To avoid the uncomfortable situation, Ms. Carvalho pretended her son was crying, went upstairs, brought him into her room, and locked the door. ECF No. 50 ¶ 111. Even though Ms. Carvalho did not return, Ms. Lindstrom did not leave but spent the night, sleeping on the couch. *Id.*

Two weeks later, Ms. Lindstrom sent Ms. Carvalho a Facebook page from Ms. Lindstrom's husband that had a drawing of a Thanksgiving turkey photo-shopped with a man's scrotum. ECF No. 41 ¶¶ 45, 46.

Later, Ms. Lindstrom scheduled a work dinner meeting with Ms. Carvalho. *Id.* ¶ 49. Ms. Carvalho alleges that during this dinner, Ms. Lindstrom held her hand affectionately and told her that she had received poor feedback from skip-level reviews – claiming that "none of the higher-ups" liked her and that Ms. Lindstrom

was the "only one protecting her." ECF No. 45 ¶ 49.  Towards the end of the year at a holiday work party, Ms. Lindstrom placed her hand on Ms. Carvalho's upper thigh during a group photo.  ECF No. 50 ¶ 116.

Ms. Carvalho did not initially report Ms. Lindstrom's conduct to Santander's Employee Relations because she believed they would not handle her complaints appropriately.   She claims that she "feared that HR was intimidated by [Ms. Lindstrom], and that [Ms. Lindstrom] would learn of [her] complaint and retaliate against [her] for doing so." ECF No. 41 ¶ 85.

### B. Work Performance

Before the spring of 2017, Santander often recognized Ms. Carvalho for her exemplary performance at work.  *Id.* ¶ 54.  She was identified as one of the top District Executives company-wide, ranked #1 in her District Peer Group and #7 in the company overall for profit/loss, and earned regular recognition as a top performer in many areas.  ECF No. 50 ¶ 121.

But that all began to change after Ms. Carvalho stopped talking to Ms. Lindstrom on a personal level.   Not long after, in mid-December 2016, Ms. Lindstrom re-assigned Ms. Carvalho to a new district and asked her to prepare a 30-60-90-day action plan, insisting that she complete it even though she was going out on vacation.[2] ECF No. 41 ¶ 52.

---

[2] Ms. Lindstrom has since acknowledged that the action plan could have waited, and it was unnecessary to make it due the day Ms. Carvalho returned from vacation. ECF No. 50 ¶ 118.

Ms. Carvalho began to receive more mixed employment reviews. Some remained positive: Ms. Lindstrom gave Ms. Carvalho a positive 2016 year-end review, rating her overall performance as "Totally Meets Expectations." *Id.* ¶ 54. Ms. Carvalho's team averaged a score of 91.7, which was the highest in the region, ECF No. 50 ¶ 123, and under Ms. Carvalho's leadership, her region continued to make improvement. *Id.* ¶ 124. Still, in early February 2017, Ms. Lindstrom told Ms. Carvalho that the head of sales ranked her a "1" on a scale of 1-10. *Id.* ¶ 120. Despite all the previous high-performance ratings Ms. Carvalho received, Ms. Lindstrom asked her to take a demotion. *Id.* ¶ 126.

Ms. Carvalho asserts that because of her supervisor's advances and her subsequent poor work evaluations, she approached an Employee Relations consultant for a meeting. ECF No. 50 ¶ 136. After a text message exchange lasting a week, Ms. Carvalho and a representative of Employee Relations scheduled a date to get coffee at the end of the week. *Id.* ¶ 138

### C. False Overtime Allegation

Days after Ms. Carvalho contacted Employee Relations, an employee approached a Branch Manager to report that Ms. Carvalho had permitted her to increase her hourly wage by adding false overtime hours to her timecard. ECF No. 41 ¶ 57. The Branch Manager brought this matter up to Ms. Lindstrom and Employee Relations. *Id.* ¶ 59. Santander fired the employee soon after. *Id.* ¶ 66.

Ms. Carvalho denied these allegations. She contended that when the employee said that she was applying for positions that paid more money, Ms. Carvalho told her

that she would speak to Ms. Lindstrom about raising her compensation, and thereafter advised her to complete Santander's relationship banker training and obtain the necessary license to be a relationship banker. *Id.* ¶ 62. Santander could not confirm the story because the employee did not provide any text or emails to support her allegations against Ms. Carvalho. ECF No. 50 ¶ 142.

After a brief chain of emails between Ms. Lindstrom and Employee Relations, they reached a consensus to fire Ms. Carvalho. ECF No. 41 ¶ 73. The email described the reasons for her termination as: "[p]oor leadership; admitted to a lack of oversight around overtime for the district; admitted to not following up with manager and gave several employees approval to work unlimited overtime due to staffing shortages; loss of over $4,000 to the Bank in overtime wages paid but not worked." *Id.* Even though Employee Relations at first recommended a final level warning rather than termination, Santander fired Ms. Carvalho. ECF No. 50 ¶¶ 149-50.

Ms. Carvalho sued Santander and Ms. Lindstrom, alleging sex discrimination, hostile work environment, and retaliation. After the discovery period closed, Santander moves for summary judgment on all counts. ECF No. 40.

## II.   STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, a party is entitled to summary judgment only if "no genuine dispute [exists] as to any material fact" and if the undisputed facts show that the party is "entitled to judgment as a matter of law." *Knight v. Mills*, 836 F.2d 659, 664 (1st Cir. 1987) (undisputed material facts, together with inferences drawn against the movant, "must lead to one reasonable conclusion in favor of the movant"

to justify summary judgment). A material fact is one that "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is a drastic remedy because it deprives the parties of the opportunity to have a jury decide the outcome of their case, as enshrined in the Seventh Amendment to the United States Constitution. U.S. CONST. AMEND. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."). Thus, the law requires that all reasonable inferences be drawn against the moving party and that the court grant summary judgment if the undisputed facts and inferences that flow from them allow for only one reasonable conclusion in favor of the movant. *Knight*, 836 F.2d at 664 (citing *Anderson*, 477 U.S. at 251). The Court must "tak[e] the facts in the light most favorable to the non-moving party and draw [] all reasonable inferences in [her] favor." *Barraford v. T & N Ltd.*, 778 F.3d 258, 263 (1st Cir. 2015).

## III.   DISCUSSION

### A. Gender Discrimination/Disparate Treatment

In Count I, Ms. Carvalho alleges that during her employment with Santander, she was treated differently because she is a woman in violation of Title VII, Rhode Island Civil Rights Act ("RICRA") and Rhode Island Fair Employment Practices Act

("RIFEPA").[3] She claims Ms. Lindstrom subjected her to inappropriate behavior that no male employees had to experience. Santander counters that Ms. Carvalho has identified no male comparators who were treated more favorably, or provided evidentiary support that Ms. Lindstrom treated her differently than she treated male District Executives.[4]

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e–2(a)(1), or "to limit, segregate, or classify [her] employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [her] status as an employee," based on a protected characteristic. 42 U.S.C. § 2000e–2(a)(2). RIFEPA and RICRA prohibit discrimination against an employee because of her race, color, religion, sex, sexual orientation, gender identity or expression, disability, age, or country of ancestral origin. R.I. Gen. Laws § 28–5–7(1); § 42–112–1.

---

[3] As is routine practice, the Court will analyze the federal and state claims together. *See Rathbun v. Autozone, Inc.*, 361 F.3d 62, 71 (1st Cir. 2004) (noting that the Rhode Island Supreme Court routinely analyzes RIFEPA claims under Title VII and that FEPA and RICRA claims rise and fall together); *Ferro v. R. I. Dep't of Transp. ex rel. Lewis*, 2 F. Supp. 3d 150, 157 (D.R.I. 2014). Ms. Carvalho's "quid pro quo" sexual harassment claim will be discussed in tandem with her hostile work environment claim in Count II.

[4] Santander also argues, in its response to Ms. Carvalho's sexual harassment claim, that Ms. Lindstrom "gave back-pats to both male and female District Executives," and posed the question "'have you ever kissed a girl?' to a group of both male and female employees" – precluding claims that such conduct was discriminatory based on gender.

Because Ms. Carvalho acknowledges there is no direct proof of gender discrimination, the Court analyzes Ms. Carvalho's claim under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, a plaintiff must prove a prima facie case, which shifts the burden to the employer to show a legitimate and nondiscriminatory or non-retaliatory reason for the alleged adverse employment action. *Id.* at 802–03. Then, if the defendant meets its burden, the plaintiff must show that the proffered reason is a pretext for discrimination or retaliation. *Id.* at 804; *Kosereis v. Rhode Island*, 331 F.3d 207, 212 (1st Cir. 2003).

For Ms. Carvalho to show a prima facie case, she must present evidence that (1) she is a member of a protected class, (2) her job performance was satisfactory, (3) Santander took some adverse employment action, and (4) Santander replaced her with a comparably qualified person. *Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 421 (1st Cir. 1996). Establishing a prima facie case is a "small showing" that is "not onerous" and is "easily made." *Kosereis*, 331 F.3d at 213. Here, it is not disputed that Ms. Carvalho, as a woman, is a member of a protected class, was at least reasonably competent in fulfilling her job duties, and was fired by Santander. She has made out a prima facie case.

The burden then shifts to Santander to articulate "some legitimate, nondiscriminatory reason" for its employment action. *McDonnell Douglas*, 411 U.S. at 802. "[T]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact,

would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)). Santander offers several nondiscriminatory reasons for terminating Ms. Carvalho. It asserts that it fired her for poor leadership as a District Executive. She admitted to not overseeing overtime hours for employees in her district, approving several employees to work unlimited overtime due to staffing shortages. These failures caused Santander to lose over $4,000. These documented reasons for termination are not based on Ms. Carvalho's gender and so Santander has met its burden under *McDonnell Douglas* to put forth a legitimate, nondiscriminatory reason for firing her.

The burden then shifts back to Ms. Carvalho to show that the reason proffered was a pretext or "a coverup" for a "discriminatory action." *McDonnell Douglas*, 411 U.S. at 805. At this third step, Ms. Carvalho's burden of producing evidence to rebut Santander's stated reason for its employment action "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5-6 (1st Cir. 2000)). The Court therefore must decide whether Ms. Carvalho has presented evidence that shows there is a genuine dispute about whether Santander's stated reasons were pretext and that she was discharged because of her gender.

Ms. Carvalho points to several scenarios in support of her gender discrimination claim. She relies on testimony from a co-worker who said that before

Santander hired Ms. Carvalho, Ms. Lindstrom made several comments to her team that she was a prototypical Santander employee–young, attractive, and energetic. The co-worker also testified that Ms. Lindstrom expressed more "affection" and favoritism towards female employees; she called Ms. Carvalho "beautiful" many times, and socialized with female employees outside of work, not with male District Executives outside of work.   Ms. Carvalho also claims that Ms. Lindstrom only questioned female employees about whether they ever kissed girls and that later events – particularly the social gatherings that occurred in early November – show that Ms. Lindstrom was only interested in Ms. Carvalho's prior sexual experiences with women and not in male District Executives experiences.

In the face of this testimony, Santander asserts that Ms. Carvalho has failed to meet the standard of proving that males were similarly situated and that she was treated differently, and that her gender was the reason for the difference. Specifically, Santander relies on the fact that Ms. Lindstrom has terminated both male and female District Executives in the past who were accused of failing to discharge their job duties: one female employee for directing an employee to alter training records to reflect falsely that employees had completed mandatory training classes, and another male employee for allowing branch employees to open accounts for persons without first complying with "know your customer" regulations. Santander further contends that increased attention toward Ms. Carvalho and exclusion of male employees from social gatherings does not amount to adverse action that can be pursued under a disparate treatment theory.

11

Based on the record evidence, the Court finds that there is insufficient evidence to allow a jury to find that the true reason for Ms. Carvalho's termination was based on her gender. A plaintiff in a disparate treatment case may try to show, as here, that others "similarly situated in all relevant aspects" were treated differently by the employer. *Kosereis*, 331 F.3d at 214. However, "[r]easonableness" is the touchstone when considering comparators in a disparate treatment case; that is, "while the plaintiff's case and the comparison cases that [she] advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances." *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999). Ms. Lindstrom's tendency to favor and give attention to Ms. Carvalho and other female employees does not, without more evidence, amount to gender discrimination against Ms. Carvalho. Ms. Carvalho has not provided evidence of a pattern of gender discrimination or evidence that her termination for work performance issues was a pretext to fire her because she is a woman. The Court GRANTS summary judgment on Count I.

### B. Hostile Work Environment and Quid Pro Quo Sexual Harassment

#### 1. *Hostile Work Environment*

In Count II, Ms. Carvalho alleges that Ms. Lindstrom's sexual harassment created a hostile work environment actionable under Title VII. She argues that the evidence shows that Ms. Lindstrom created a toxic work environment due to the inappropriate sexual innuendo and advances and that she was fired when she did not

give in to Ms. Lindstrom's sexual advances.[5]  Santander seeks judgment on this claim, arguing that Ms. Lindstrom's conduct was not severe or pervasive enough to constitute harassment.   In particular, Santander argues that Ms. Lindstrom's conduct was not unwelcome because Ms. Carvalho avidly pursued an ongoing friendship.  Santander also claims that because Ms. Carvalho failed to report the alleged sexual harassment to anyone at Santander, the incidents did not subjectively affect the conditions of her employment.

A plaintiff may prove a Title VII violation by showing that "an employer required [her] to work in a hostile or abusive environment." *Franchina v. City of Providence*, 881 F.3d 32, 45 (1st Cir. 2018).   To prove that she endured a hostile work environment based on gender discrimination, a plaintiff must show the following prima facie elements:

> (1) she is a member of a protected class;
>
> (2) she was subject to unwelcome harassment;
>
> (3) the harassment was based on her membership in a protected class;
>
> (4) the harassment was severe enough or pervasive enough to alter the conditions of her employment and create an abusive work environment;
>
> (5) the harassment was both objectively and subjectively offensive; and
>
> (6) there is some basis for employer liability.

*Flood v. Bank of Am. Corp.*, 780 F.3d 1, 10 (1st Cir. 2015).

Ms. Carvalho meets the first three elements—she is a member of a protected class, that she considered the sexual advances unwelcome, and the harassment was

---

[5] She also claims that she was systematically and often harassed for eleven months, equating to "quid pro quo sexual harassment," which is discussed below.

based on her gender. "In hostile work environment cases, the fourth and fifth elements are typically the most important." *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001). A fact finder must consider these elements "in the light of 'the record as a whole' and 'the totality of the circumstances.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69 (1986) (quoting 29 CFR § 1604.11 (b) (1985)).

Turning to the fourth element, the First Circuit mandates that to be considered hostile, the environment must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Kosereis*, 331 F.3d at 216 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). This standard "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Aponte-Rivera v. DHL Sols. (USA), Inc.*, 650 F.3d 803, 808 (1st Cir. 2011) (quoting *Harris*, 510 U.S. at 21). Thus, the Court should "distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005).

First, a note on the legal precedent of the "severe or persuasive" standard. Over the past thirty years, while our society has continued to evolve in its recognition of what constitutes inappropriate behavior in the workplace, federal courts have increasingly narrowed the definition of what constitutes "severe or pervasive"[6]

---

[6] Courts have often referred to the "severe *or* pervasive" standard as "severe *and* pervasive" as if a showing of both severity and pervasiveness is needed to state a claim. While some courts have clarified the standard per United States Supreme

conduct. This increasingly restrictive pattern has raised the threshold of what plaintiffs must prove to have their hostile work environment claim survive dismissal, let alone succeed on the merits.

The gulf between social standards and the "severe or pervasive" legal standard has become undeniable. While society sees slapping someone's butt, forcing an employee to look at pornography, rubbing an employee's shoulders in a sexual manner, or staring at an employee's breasts to be sexual harassment, the courts continue to dismiss cases involving similar behavior because case law suggests that it constitutes "run-of-the-mill" behavior.[7] Indeed, much of what courts have historically described as "mere boorish behavior," or "unpleasant vicissitudes of the workplace," considered insufficient for surviving summary judgment, would be considered sexual harassment by most workers today.[8]

---

Court precedent, many continue to use the standard incorrectly. *Compare Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (clarifying that the correct standard is "severe or pervasive" and that under the correct standard, a single use of the n-word can suffice to state a claim), *with Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015) (holding that calling an employee a "porch monkey" was not severe or pervasive enough as to constitute unlawful discrimination); *see also Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) (noting that the district court applied the wrong legal standard); *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) (noting "[h]arassment need not be severe *and* pervasive to impose liability; one or the other will do); *Indest v. Freeman Decorating, Inc.*, 168 F. 3d 795, 802 (5th Cir. 1999) (emphasizing that the standard is the disjunctive severe *or* pervasive).

[7] Sheila Engelmeier & Heather Tabery, Severe or Pervasive: Just How Bad Does Sexual Harassment Have to Be in Order to Be Actionable?, MINN. ST. BAR REV. (Jan. 21, 2020).

[8] Sheila Engelmeier & Heather Tabery, Paskert and Kenneh: The "Severe or Pervasive" Standard in 2020 Minnesota Moves Forward on Workplace Harassment; the 8th Circuit Doubles Down, Bench & B. Minn., August 2020, at 24, 27.

The Court believes that Chief Justice Earl Warren's command from over 60 years ago, made about the Eighth Amendment, rings equally true for Title VII: courts must consider the hostile work environment standards in light of "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). To remain fair and just, courts must apply the standard in a manner that reflects such changes in societal attitudes. Some courts have done just that. A steady chorus of criticism about the "severe or pervasive" standard for hostile work environment claims is rising.[9]

So, with that, the Court must determine whether Ms. Carvalho has produced sufficient evidence to support a finding of severe or pervasive misconduct: the severity of the conduct, its frequency, how much the behavior is physically threatening or humiliating rather than an isolated offensive utterance, and how much it unreasonably interferes with an employee's work performance. *Franchina*, 881 F.3d at 46. The Court finds that Ms. Carvalho has presented evidence that Ms. Lindstrom sexually harassed her when: (1) Ms. Lindstrom asked her about "kissing a girl"; (2) she asked about prior sexual experiences with women, particularly related to oral sex; (3) she tried to hold her hand at dinner; (4) said that "none of the higher-ups" like her and that she [Ms. Lindstrom] was the "only one protecting her"; and (5) Ms.

---

[9] So far, New York and California have passed laws removing or effectively encouraging removal of the "severe or pervasive" standard. Colorado, Vermont, and Minnesota have also been exploring ways of redefining the standard. Andrew R. Turnbull & Cooper J. Spinelli, *Is Time Up for the Severe or Pervasive Standard? Harassment Claims in 2020 and Beyond*, Morrison Foerster Employment Law Commentary (Feb. 11, 2020), https://elc.mofo.com/topics/Is-Time-Up-For-The-Severe-Or-Pervasive-Standard-.html.

Lindstrom forwarded her a Facebook post containing a sexual image. *Hernandez–Loring v. Universidad Metropolitana*, 233 F.3d 49, 54–56 (1st Cir. 2000) (evidence of two specific incidents of harassment in the context of an ongoing pattern of conduct found sufficient to survive summary judgment in a hostile work environment claim); *Williams v. General Motors Corp.,* 187 F.3d 553, 563–64 (6th Cir. 1999) (the accumulated effect of incidents of humiliating, offensive comments directed at women and work-sabotaging pranks, taken together, can constitute a hostile work environment). Ms. Carvalho met the fourth element.

As for the fifth element, Ms. Carvalho subjectively perceived her work environment as hostile and offensive. However, the parties disagree about several facts relevant to deciding whether the harassment was objectively offensive. Broadly, Ms. Carvalho and Ms. Lindstrom have wildly divergent accounts of what happened at the social gatherings. As a result, this case must be considered on its facts and within its individual context. Rather than relying on decades-old cases where courts found no sexual harassment in the context of egregious sexually harassing behavior, courts should leave the difficult work of grappling with the facts, applying the law, and establishing norms about what conduct is considered appropriate in our rapidly evolving social and cultural climate to juries.

In determining reasonableness, a jury is far more capable of determining what constitutes an objectively hostile work environment for a reasonable person in the

plaintiff's position than is a judge.[10]  A reasonable person could conclude that these instances constitute "sexual harassment"–that is, sex-based discrimination that creates a hostile work environment.  *See White v. N. H. Dep't of Corr.*, 221 F.3d 254, 260–61 (1st Cir. 2000) (evidence of sexual remarks, innuendoes, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment).  "Subject to some policing at the outer bounds," it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment.  *Marrero v. Goya of P. R., Inc.*, 304 F.3d 7, 19 (1st Cir. 2002) (quoting *Gorski v. N.H. Dep't of Corr.*, 290 F.3d 466, 474 (1st Cir. 2002)).

Resolving all factual disputes in favor of the non-moving party, the Court finds that a reasonable jury could find that Ms. Lindstrom's conduct was subjectively and objectively offensive.  Thus, as there is some evidence of employer liability (the sixth factor), Ms. Carvalho's hostile work environment claim survives Santander Bank's Motion for Summary Judgment.

### 2. *Quid Pro Quo*

Ms. Carvalho alleges that she experienced quid pro quo sexual harassment. This type of sex discrimination occurs when an employee or supervisor uses "'her

---

[10] For example, while pervasiveness of conduct may typically be determined from an objective standpoint based on factors such as the frequency of the alleged harassment, severity of conduct is a subjective assessment. A jury, combining a range of the group perspectives and experiences, is much better equipped than an individual judge to evaluate whether a particular instance of alleged harassment might be considered severe.

superior position to extract sexual favors from a subordinate employee, and if denied those favors, retaliates by taking action adversely affecting the subordinate's employment.'" *Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016) (quoting *O'Rourke*, 235 F.3d at 728).

Ms. Carvalho argues that her employment was in jeopardy *after* she refused to engage with Ms. Lindstrom's sexual advances.   She points specifically to: (1) Ms. Lindstrom assigning her a report during her vacation; (2) Ms. Lindstrom threatening her by saying that her job performance was unsatisfactory according to higher-up officials in the face of Ms. Carvalho receiving awards for exceptional performance; (3) Ms. Lindstrom asking her to take a demotion; and (4) Ms. Lindstrom effectively ensuring that she was ignored during conference calls.   Ms. Carvalho claims that these instances amount to explicit alterations in the terms of her employment after she rejected Ms. Lindstrom.

The Court finds that Ms. Carvalho has presented evidence of sufficiently severe or pervasive acts of quid pro quo sexual harassment.   While there are many disputes over the intended effect of her conduct, there is sufficient evidence for a jury to consider that Ms. Lindstrom used her power as Ms. Carvalho's supervisor, tried to engage with Ms. Carvalho sexually, and when she was denied, retaliated against her by threatening her, offering her a demotion, and requiring her to work during vacation as punishment.   Even isolated incidents may, "if egregious enough, suffice to evince a hostile work environment." *Noviello*, 398 F.3d at 92.

As to Ms. Carvalho's Count II, the Court finds that the evidence in this record is enough to defeat summary judgment. Many of Santander's arguments are oblique criticisms of Ms. Carvalho's credibility. These disputes are for the jury – not the Court – to resolve. *See Perez v. Town of North Providence,* 256 F. Supp. 3d 139, 152 n.5 (D.R.I. 2017). The Court DENIES summary judgment on Count II.[11]

## C. Retaliation

In Count III, Ms. Carvalho argues that her termination was not a result of her job performance, but a retaliatory response to her seeking to meet with Employee Relations about her sexual harassment allegations. As evidence of pretext, Ms. Carvalho notes that the day after she initiated contact with Employee Relations, the investigation into the overtime issue, for which she was fired, began. She argues that causation can be inferred from the close temporal relationship between the protected activity and the adverse employment action. Santander moves for summary judgment on Count III, alleging that Ms. Carvalho did not engage in protected activity and that even if she did there is no causal connection between Ms. Carvalho's termination and her claim of sexual harassment.

The Supreme Court held that "[t]he text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under §2000e-3(a) must

---

[11] Santander points to its established complaint procedure for processing employee complaints as an affirmative defense under *Farragher-Ellerth.* Genuine issues of material fact exist as to the effectiveness of Santander's program to address sexual harassment; a jury should decide whether Santander has met the elements of the defense.

establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). Courts evaluate retaliation termination claims based on circumstantial evidence using the *McDonnell Douglas* burden-shifting framework. *Gerald v. Univ. of P. R.*, 707 F.3d 7, 24 (1st Cir. 2013). To make a prima facie showing of retaliation, the plaintiff must show that she engaged in protected conduct, that she suffered an adverse employment action, and that a causal nexus exists between the protected activity and the adverse action. *Id.* Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision; if the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action resulted from the defendant's retaliatory animus. *Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 46 (1st Cir. 2010). There is no question that Ms. Carvalho suffered an adverse employment action; we address the other requirements in turn.

On the issue of protected conduct, Santander argues that Ms. Carvalho does not point to evidence of "opposing, resisting or complaining about Lindstrom to Santander management, Lindstrom herself, or Employee Relations/HR" and thus she did not engage in protected conduct. Ms. Carvalho counters that by scheduling a meeting with Employee Relations, she was engaging in protected conduct, although she did not get the chance to voice her concerns because she was promptly fired.

The Court finds that Ms. Carvalho's attempt at scheduling a meeting with Employee Relations, although nondescript, may constitute protected conduct that satisfies the first prong of her retaliation claim. *See Arroyo-Ruiz v. Triple-S Mgmt. Grp.*, 206 F. Supp. 3d 701, 716 (D.P.R. 2016) (plaintiff did not take part in any formal investigation or file any sort of administrative claim but did contact the human resources department to complain about discrimination he suffered, which constituted protected conduct). Given that Title VII was designed to protect the right of an employee to bring a complaint against their employer, it would be inappropriate for the Court to draw the line of protected conduct beyond an employee's attempt to schedule a meeting to complain. *See also Planadeball v. Wyndham Vacation Resorts Inc.*, 793 F.3d 169 (1st Cir. 2015) ("[p]rotected conduct includes 'the filing of formal charges of discrimination' as well as 'informal protests of discriminatory employment practices, including making complaints to management . . ..'"). Ms. Carvalho has satisfied the first element.

Under the third element, Ms. Carvalho must show a nexus between her protected conduct – her scheduling a meeting with Employee Relations – and the adverse employment action that she suffered – her termination days later. When there is a lack of direct evidence of a causal link between a plaintiff's protected conduct and subsequent adverse employment action, courts look to temporal proximity to satisfy the causal connection element. *Calero-Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 25 (1st Cir. 2004). The First Circuit has noted that "[w]hen an adverse employment action 'follows hard on the heels of protected activity, the timing

often is strongly suggestive of retaliation'" under Title VII. *Collazo*, 617 F.3d at 50 (quoting *Noviello*, 398 F.3d at 86).

The Supreme Court has observed, however, that when mere temporal proximity between an employer's knowledge of protected activity and an adverse action is accepted as sufficient evidence of causality, the proximity "must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). In line with the Supreme Court's observation, the First Circuit has found that a "tight fit" is required, and that "a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action." *Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010).

At the summary judgment stage, "a plaintiff need not 'prove by a preponderance of the additional evidence that [retaliation] was in fact the motive for the action taken,'" only that there are record facts that would allow a factfinder to find that an adverse employment action was motivated by retaliation. *Collazo*, 617 F.3d at 50 (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000)). "Courts should be especially cautious before granting summary judgment when pretext and retaliatory animus are at issue." *Harrington v. Aggregate Indus.- Northeast Region, Inc.*, 668 F.3d 25, 33 (1st Cir. 2012) (the types of evidence that can give rise to an inference of pretext are "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffer'" and "deviations from standard procedures, the sequence of occurrences leading up to a challenged decision, and close temporal proximity between relevant events.").

Santander asserts that (1) Ms. Lindstrom allegedly did not know about Ms. Carvalho's scheduled meeting with Employee Relations and (2) there was a six-month period between Ms. Lindstrom's alleged sexual harassment and Ms. Carvalho's scheduled meeting. Ms. Carvalho counters with the fact that "mere days" after scheduling a meeting with Employee Relations, she was fired, even though Employee Relations recommended otherwise. Ms. Carvalho also argues that throughout the six-month period, her job was in danger even though her work performance was satisfactory, if not exceptional. As relevant facts, she points specifically to (1) Ms. Lindstrom firing an employee in the past by looking for a reason to "get him"; (2) Ms. Lindstrom asking her to complete a work assignment during her paid time off when it could have been completed thereafter; (3) Ms. Lindstrom asking her if she wanted to take a demotion; and (4) Ms. Lindstrom allegedly telling her that the higher-up officials did not like her. The Court finds that the facts that both parties recite surrounding Ms. Carvalho's job security, scheduled meeting, and termination are material and disputed such that a jury might find that there is a causal connection based on temporal proximity.

With the prima facie case satisfied, the burden then shifts to Santander to prove "'by a preponderance of the evidence that the same decision would have been made absent the discrimination.'" *Lipsett v. Univ. of P. R.*, 864 F.2d 881 at 899 (1st Cir. 1988) (quoting *Fields v. Clark Univ.*, 817 F.2d 931, 937 (1st Cir. 1987)). Ms. Carvalho has produced evidence that she was fired within days after scheduling a meeting with Employee Relations, and that Santander did not

investigate or reprimand two other employees that handled managing overtime – the purported grounds for firing Ms. Carvalho.  A reasonable factfinder could find that this temporal proximity shows pretext and a causal connection.  Santander has thus not met its burden in showing that the same decision would have been made absent Ms. Carvalho's attempt to schedule a meeting with Employee Relations.[12]

Viewing the summary judgment record in the light most favorable to Ms. Carvalho, the material facts here raise a genuine issue on whether retaliatory animus motivated Santander's employment action against Ms. Carvalho.  Specifically, whether Ms. Carvalho was fired because of her work performance or in retaliation because she stonewalled Ms. Lindstrom's sexual advances and was about to report Ms. Lindstrom to Employee Relations comes within the purview of Title VII's prohibition on retaliation.  The Court therefore DENIES summary judgment on Count III.

## IV.   CONCLUSION

The Court agrees that "in cases involving women plaintiffs where legal arguments are frequently novel and innovative, where subtle issues of credibility, inferences, and close legal questions may be involved, where issues concerning the 'genuineness' or 'materiality' of facts are frequently intertwined with law, a single district judge may be a less preferable decision maker than a jury.  Juries are likely to be far more diverse and bring a broader range of perspectives to bear on the

---

[12] Furthermore, Ms. Carvalho argues that the overtime issue is a falsity given that she claims she never advised anyone to inflate their timecard, as well as the fact that directly reviewing timecards was not part of her job duties.

problem." Elizabeth M. Schneider, *The Dangers of Summary Judgment: Gender and Federal Civil Litigation*, 59 Rutgers L. Rev. 705, 712 (2007); *see also Ganzy v. Allen Christian School*, 995 F. Supp. 340, 360-61 (E.D.N.Y. 1998).

Therefore, a jury should hear Ms. Carvalho's case on two counts.  The Court GRANTS IN PART AND DENIES IN PART Santander's Motion for Summary Judgment.  ECF No. 40.  The Court GRANTS summary judgment on Count I and DENIES summary judgment on Counts II and III.

IT IS SO ORDERED.

_____

John J. McConnell, Jr.
Chief Judge
United States District Court

November 29, 2021